Dear Senator Bass:
This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:
 Is a Phone Card Sweepstakes machine a "slot machine" as defined by 21 O.S. 2001, § 964[21-964]?
 INTRODUCTION: THE MACHINES
The machines you inquire about are often located in bars, convenience stores, bingo halls, bowling alleys and similar businesses; they are stand-alone units with video terminals that give patrons an opportunity both to purchase a phone card and to participate in a game to win money. Although such machines are made by several manufacturers and have different video game faces and components, all the machines brought to our attention share the following common features:
 • The player begins the transaction by inserting cash into a bill acceptor integrated into the machine's cabinet.
 • When cash is inserted into the bill acceptor, a Phone Card is dispensed from an integrated thermal printer or roll of preprinted Phone Cards in the machine, with the Phone Cards having a phone number to call with a pin number(s) (in some machines the pin numbers appear to be unique, in others they are all the same).
 • A Phone Card represents that it entitles the player to make a long distance phone call for a specified number of minutes, often two minutes, but in some instances as much as eight minutes, by calling the number provided, using the pin number(s) and following directions. Though not material to our analysis here, not all phone *Page 2 
cards, despite representations on the cards, allow the holder to actually make a long distance phone call.
 • The machines, which are the size and shape of video slot machines, have video screens that display various video graphic game configurations. Some have nine reels, (arranged in a 3 x 3 grid) that spin and stop either automatically or with some control by the player, while others may have five video reels or other games. In all cases, the machines require currency to be inserted prior to any game play, and the player wins or loses the money inserted or credits which the money buys (usually 20 credits for each dollar inserted) based upon the play of the game.
 • Some game configurations arguably have some element of skill as the player, by pushing a button or otherwise, can attempt to stop the reels where desired. In other configurations, the spin of the reels stops automatically.
 • When the reels stop automatically, whether a play is a winning play is predetermined by either: (1) a device such as the computer cartridge, a finite cartridge, that contains a large number of pre-shuffled cards with a predetermined number of winners at various odds (5 to 1, 10 to 1, 100 to 1, etc.); or (2) by a roll of preprinted cards with a set number of predetermined winners at various amounts in each roll. For example, a roll of 750 tickets may have ten $5.00 winners, three $50.00 winners, etc.
 • When money inserted into the machine entitles the player to credits, the player has to determine how many credits he or she will wager on each play of the game. This is usually accomplished by pushing a button marked "Play," with each push of the button wagering an additional credit until the desired amount of the wager is reached. Then the game is played by pushing a second button, usually marked "Start."
 • In machines with reels that stop automatically, the spinning video reels' stop is predetermined by the same mechanisms. In the case of the game cartridge, the cartridge controls the video action. In the case of a roll of preprinted cards, the video action is controlled through use of a scanning reader that reads a code on the card being dispensed. Whether a player wins on any play of these machines is totally determined by chance.
 • In so-called "skill machines," where the player has some ability to affect where the reels stop, the game outcome is determined by a combination of chance and skill. *Page 3 
 • In the case of machines that issue credit for each $1.00 inserted, the amount won is based upon both the amount of credits wagered and the "symbols on the reels" when the reels stop. Thus, for example, a configuration of 2 cherries and 1 lemon might pay out at 5 to 1, whereas 3 shamrocks might pay out at 100 to 1.
 • In the machines with rolls of preprinted tickets, whether a play is a winning play is determined by the images printed on the ticket. For example, the printed image of 3 cherries in a row might entitle a player to win $5.00 and the printed image of 3 lucky 7's in a row might entitle a player to win $100.00.
 • In short, the machines offer reel-spinning games with outcomes that are either totally determined by chance or are determined by a combination of chance and skill.
 • Players may cash out any credits won usually by pushing a button marked "Print Voucher" or "Ticket," whereupon the machine prints out a voucher identifying the cash value of the accumulated points. These vouchers are then redeemed for cash.
 • In the case of machines that have rolls of preprinted cards, winning cards are also redeemed for cash.
 • Finally, some vendors make a single $1.00 play of a game or play for a limited number of credits available for free by mailing a self-addressed, stamped envelope to a specified address, in response to which a free entry authorization — one entry per envelope only — will be sent by return mail. The machines, however, have no visible means to facilitate a "free" play; the machines only accept cash and there is no means for a patron to activate play other than through the insertion of cash. Thus, when a free play authorization is presented at a facility housing a machine the establishment either inserts a $1.00 bill into the machine or otherwise permits a "free" play.
You ask whether such so-called Phone Card Sweepstakes machines are "slot machines" as defined in Oklahoma law.
 I. OKLAHOMA LAW OUTLAWING SLOT MACHINES
Under the provisions of 21 O.S. 2001, § 969[21-969], it is "unlawful for any person to have in his possession any slot machine" or to "sell or solicit the sale, or take orders for the sale of, or lease or rent any slot *Page 4 
machine." Further, under the provisions of 21 O.S. 2001, § 970[21-970], "[a]ny person who sets up, operates or conducts, or who permits to be set up, operated and conducted, in or about any place of business, or in or about any place, whether as owner, employee or agent, any slot machine for the purpose of having or allowing same to be played by others for money, property, tangible or intangible, coin, currency, check, chip, token, credit, or any representative of value or a thing of value, except amusement or entertainment" is guilty of a misdemeanor.
Additionally, under the provisions of 21 O.S. 2001, § 972[21-972], every slot machine is "declared to be per se a gambling device," and is "declared to be a public nuisance." Further, under 21 O.S. 2001, § 973[21-973](A), law enforcement officers are required to seize slot machines together with all money in the machines or used in connection with the machines.
The definition of "slot machine" that is applicable to the above-quoted criminal statutes is broad and is set forth at 21 O.S. 2001, § 964[21-964], which provides:
 A. For the purpose of Sections 964 through 977 of this title, "slot machine" is defined to be:
 1. Any machine, instrument, mechanism, or device that operates or may be operated or played mechanically, electrically, automatically, or manually, and which can be played or operated by any person by inserting in any manner into said machine, instrument, mechanism, or device, a coin, chip, token, check, credit, money, representative of value, or a thing of value, and by which play or operation such person will stand to win or lose, whether by skill or chance, or by both, a thing of value; and
 2. Any machine, instrument, mechanism, or device that operates or may be played or operated mechanically, electrically, automatically, or manually, and which can be played or operated by any person by paying to or depositing with any person, or by depositing with or into any cache, slot, or place a coin, chip, token, check, credit, money, representative of value, or a thing of value, and by which play or operation such person will stand to win or lose, whether by skill or chance, or by both, a thing of value.
Id. (emphasis added).
Subsections B, C and D of Section 964 indicate that the criminal prohibitions shall not apply to "crane machines," slot machines twenty-five (25) years or older when not used for gaming purposes, nor to machines used for the purpose of teaching slot machine repair and not used for gambling purposes. *Page 5 
 B. Sections 964 through 977 of this title shall not apply to a slot machine:
 1. If the slot machine is twenty-five (25) years or older and is not used for gambling purposes; or
 2. If the slot machine is used for the purpose of teaching slot machine repair and is not used for gambling purposes.
 C. Sections 964 through 977 of this title shall not apply to use of a crane machine for nongambling purposes. For purposes of this section, "crane machine" shall mean a machine that upon insertion of a coin, bill, token or similar object, allows the player to skillfully use one or more buttons, joysticks or other controls to maneuver a crane or claw over a toy or novelty in an attempt to retrieve the toy or novelty for the player. The toy or novelty shall not be subject to being exchanged for any other prize, including but not limited to credits, money or other thing of value.
 D. A slot machine which is twenty-five (25) years or older or is used for teaching slot machine repair which is used for a gambling purpose in violation of the provisions of Section 970 of this title shall be subject to confiscation as provided by Section 973 of this title.
Id. (emphasis added).
The anti-slot machine provisions also include a definition of "a thing of value" which includes money, coins, currency, tokens, property and various other representatives of value, Section 965 providing:
 For the purposes of this act, "a thing of value" is defined to be any money, coin, currency, check, chip, token, credit, property, tangible or intangible, or any representative of value or any other thing, tangible or intangible, except amusement or entertainment, calculated or intended to serve as an inducement for anyone to operate or play any slot machine or punch board.
Id. (emphasis added) (footnote omitted).
 II. PHONE CARD SWEEPSTAKES MACHINES ARE SLOT MACHINES PROHIBITED BY OKLAHOMA'S CRIMINAL CODE
In determining whether Phone Card Sweepstakes machines are "slot machines," we are not asked to determine if the phone cards distributed by the machines have value or if they are themselves gaming devices. Rather, we are asked to determine if the machines distributing the Phone Cards are "slot machines." We conclude that they are. *Page 6 
As noted above, the Phone Card Sweepstakes machines can be and are played or operated by inserting money. Also, persons playing the spinning reel games stand to win — by chance or skill or both — something of value, either vouchers which may be redeemed for cash money, or winning phone cards which may also be redeemed for cash money. Further, the games are electronic games and thus they are played electronically. The machines are thus "slot machines" as defined above, because:
 1. They may and are played by inserting cash money into the machine,
 2. By operating the machine electronically the player stands to win something of value, either vouchers or preprinted cards that may be redeemed for cash money, and
 3. By operating the machine the player, either totally by chance or through a combination of chance and skill, stands to win something of value, cash.
The National Indian Gaming Commission in its Game Classification Opinion, Phone Card Sweepstakes Machine, dated October 17, 2003, 1 found that Phone Card Sweepstakes machines were Class III gaming machines under the Indian Gaming Regulatory Act. In so finding, the Commission noted that manufacturers or commercial vendors owning and/or placing Phone Card machines often advance two arguments in support of their position that Phone Card Sweepstakes machines are not gambling devices. See id. First, they argue that "a patron actually receives something of benefit in addition to the opportunity to play the sweepstakes video game." Id. Under this argument, they claim that the "money placed in the machine — the consideration — is paid for the purchase of the phone card" and not for the game play. Second, they argue that a "player can receive a free play of the game by sending in a letter request to the owner" or manufacturer; this, they argue, means "that consideration is not required." Id. We find neither argument persuasive.
Both arguments attempt to eliminate "consideration," the "payment of money or something of value," from the transaction. They fail to do so. First, the argument that because the Phone Card Sweepstakes machine dispenses a phone card that has value, there is no consideration for playing the games, ignores the reality of the machine's workings and the transaction using the machine. By inserting money into the machine's bill acceptor, the patron receives two things, a phone card and an opportunity to play the game. Thus, at least some of the consideration is for playing the game, *Page 7 
despite claims vendors might make. Second, consideration is present under such circumstances, because money had to be placed into the machine to obtain the phone card — you had to buy a product — the Phone Card — in order to play. Third, as the Alaska Attorney General's Office noted in its October 17, 2000, Attorney General Opinion (which concluded that Phone Card Sweepstakes were illegal under Alaska law, and that the phone card dispensers were illegal gaming devices under Alaska's law), "phone card dispensers are designed to mimic slot machines, which undercuts any argument that the primary motivation of a would-be purchaser is to obtain a phone card." 2000 Op. Alaska Att'y Gen. (Oct. 17; 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) at 3, available at
http://www.law.state.ak.us/scripts/dtSe arch/opinions_search.html.
Reaching a similar conclusion, Attorney General Ryan of Illinois stated in Attorney General Opinion 98-110:
 It is "the lure of an uncertain prize", however, that appears to motivate a purchaser to patronize the Lucky Shamrock Dispenser. The lure of a prize is enhanced by the physical attributes of the Lucky Shamrock Dispenser — the Dispenser contains audio and video effects to announce the vending of a winning Phone Card, not unlike those displayed on slot machines. These physical attributes would do nothing to enhance the machine's value as a Phone Card dispenser, but would certainly advertise the fact that it is possible to win a prize by patronizing one.
Id. at 6, available at
http://www.illinoisattorneygeneral.gov/opinions/1998/98-010.pdf.
In short, we conclude, as the California Court of Appeals did inPeople ex rel. Lockyer v. Pacific Gaming Technologies,98 Cal.Rptr.2d 400, 403 (Cal. Ct. App. 2000), that "[s]ince the machine also dispenses a chance to win the sweepstakes, it givesmore than the merchandise — which means the sum deposited is not the `exact consideration' for the telephone card." Part of the consideration is for the chance to play and perhaps win. The fact that merchandise is also sold in the form of a Phone Card does not change that.
The so-called "free game" play option, the "no purchase necessary" option, does not change our conclusion. As noted above, some vendors offer a free play option where a patron can play the game without having to purchase a Phone Card by mailing a self-addressed stamped envelope to a specific address, in response to which a free entry authorization — one entry per envelope only — will be sent by return mail. When presented to a participating vendor, this authorization permits the holder one free play or a play for a limited number of credits — usually the minimum number of credits. We would first note that this is hardly a "free" game play. The costs of mailing a letter, together with the required self-addressed, stamped envelope requires the expenditure of 88 cents for postage. Coupled with the expense of two envelopes, say at 3 cents each, this makes the cost of a "free, one dollar play" 94 cents.
The fact that on occasion a "free" play is permitted does not negate the fact that many players deposit money in the machines, nor does it change the nature and characteristics of the machine. As the *Page 8 
National Indian Gaming Commission held, "The argument that some players can play for free by requesting a voucher for a free play from the vendor may be useful to evaluating the individual transaction played with the free voucher but it does not serve to control the characterization of the device generally. Each transaction, or game, can be viewed independently." See Game Classification Opinion, at 4.
This alternative method of playing a single or limited number of game plays for "free" does not change the characteristics of the machine: by inserting money into the machine, a player stands a chance to win something of value either totally through chance or through a combination of chance and skill, and thus the machine is a slot machine as defined in 21 O.S. 2001, § 964[21-964].
It is, therefore, the official Opinion of the Attorney Generalthat:
 1. A Phone Card Sweepstakes machine, which in response to a player inserting money (or chips, tokens, checks, credits, representatives of value or other things of value) into the machine dispenses a Phone Card, entitling the player to make a long distance phone call for a specified number of minutes, and also entitles the patron to play a game by use of a video terminal or otherwise, and by which the player or operator stands to win or lose (whether by skill or chance, or both) a thing of value (such as a card or voucher entitling winners to redeem the same for cash) is a "slot machine" as defined by Section 964 of Title 21 of the Oklahoma Statutes.
 Under Section 964's broad definition of "slot machine," the same conclusion would be reached even if no money, token, chip, etc. were inserted into the machine, if the machine "can be played or operated by any person by paying to or depositing with any person, or by depositing with or into any cache, slot or place a coin, chip, token, check, credit, money, representative of value, or a thing of value." Id. § 964(A)(2).
 Nor does it matter what mechanism is used to determine a game's outcome; it can be mechanical, electronic, automatic or manual. Thus, the same conclusion would be reached regardless of whether a machine uses a random number generator, a finite cartridge of pre-shuffled cards, a roll of preprinted cards or other means to determine winners and losers — as long as the outcome is determined by chance or skill or both.
 Nor does it matter if the vendor offers a "free game," a "no purchase necessary" option which permits a patron (by mailing a self-addressed, stamped envelope or otherwise) to obtain a "free play." Such "free play" does not negate the fact that many players deposit money into the machines, nor does it change the nature and characteristics of the *Page 9 machine — the machines are still "slot machines" as defined by 21 O.S. 2001, § 964[21-964].
 2. Under the provisions of 21 O.S. 2001, § 969[21-969], it is unlawful for any person to possess, sell or solicit the sale of, take orders for, or lease or rent such a Phone Card Sweepstakes machine.
 3. Further, under the provisions of 21 O.S. 2001, § 970[21-970], it is illegal to set up, operate, or conduct or permit someone to set up, operate or conduct such a Phone Card Sweepstakes machine in or about a place of business for the purpose of having or allowing the machine to be played by others for money, property, tangible or intangible, coin, currency, check, chip, token, credit, or any representative of value or thing of value.
 4. Further, such a Phone Card Sweepstakes machine, under the provisions of 21 O.S. 2001, § 972[21-972], is declared to be a per se gambling device and a public nuisance. Such Phone Card Sweepstakes machines are also subject to seizure under 21 O.S. 2001, § 973[21-973].
W.A. DREW EDMONDSON Attorney General of Oklahoma
NEAL LEADER Senior Assistant Attorney General
1 See
http://www.nigc.gov/ReadingRoom/GameClassificationOpinionsold/ Othergames/OtherGames07/tabid/570/De fault.aspx (last visited Aug. 25, 2009) [hereinafter Game Classification Opinion]. *Page 1